## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**GARY LYNN HAND**
**DARLA JEAN HAND,**

                    Debtors.

Case No. **08-61264-11**

## *MEMORANDUM  OF  DECISION*

At Butte in said District this 5th day of May, 2009.

In this Chapter 11 bankruptcy case, confirmation of the Debtors-in-Possession's ("DIP")

Chapter 11 Plan of Reorganization, filed December 15, 2008 (the "Plan") (Docket No. 27), the

objection thereto (Docket No. 62) and a motion to modify stay (Docket No. 31) filed by secured

creditors Jack & Gail Downes, Ed Engel, Cheryl Fraser, Gregg Fraser, Tim. L. Guenzler,

Guenzler Family Trust, Max & Marianne Johnson, Susan Piedalue, Corey & Kathy Richwine,

Linda L. Roberts, Karl Roesch, Carole S. Romey, Ronan Telephone Company Employee Profit

Sharing Plan, The Ogle and Worm, Attorneys at Law, Profit Sharing Plan, and Shirley Unruh

(together referred to as the "Secured Creditors") are pending.  A hearing on these matters was

held on February 12, 2009.  The parties appeared represented by counsel.  Testimony of

witnesses was heard, and competing appraisals of the DIP's real property offered by the DIP (Ex.

1) and the Secured Creditors (Ex. A) were admitted into evidence.  At the conclusion of the

hearing the Court closed the record and took the matters under advisement.  After review of the

record and applicable law, for the reasons set forth below, this Court sustains the objection to

1

confirmation filed by the Secured Creditor based upon the "fair and equitable" requirement of 11 U.S.C. § 1129(b)(2)(A)(i)(ii), and orders this case dismissed[1].

This Court has jurisdiction in this Chapter 11 bankruptcy under 28 U.S.C. § 1334(a). Confirmation of the DIP's Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L). At issue is the valuation of the DIP's real property that is the security for the Secured Creditors' claim, and whether DIP's Plan satisfies the requirements of § 1129(b)(2)(A)(i)(II). This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

The DIP were represented at the hearing by attorney Jon R. Binney ("Binney") of Missoula, and DIP Gary Lynn Hand ("Gary") testified. The Secured Creditors were represented by attorney Christy L. Brandon ("Brandon") of Bigfork, Montana. Also testifying were DIP's realtor Austin McKee ("McKee"), Member Appraisal Institute ("MAI") certified commercial real estate appraiser Nicholas J. Hogan ("Hogan") who is a partner with appraiser Steve Hall ("Hall") in Hall-Widdoss and Company, P.C. ("Hall-Widdoss"), the firm which prepared the appraisal offered by the DIP as Ex. 1. The Secured Creditors called witnesses Randall S. Ogle ("Ogle"), who is trustee of The Ogle and Worm, Attorneys at Law, Profit Sharing Plan, and MAI appraiser Thomas G. Stevens ("Stevens") to testify, and Stevens' appraisal Ex. A was admitted. The Court took judicial notice of Proofs of Claim Nos. 4 and 5 filed by the Secured Creditors[2], and took

---

[1]With dismissal of this case the stay is terminated under 11 U.S.C. § 362(c)(2)(B). Thus the Secured Creditors' motion to modify stay is moot, as is their application for attorney fees and costs (Docket No. 60) and DIP's objections to Claim Nos. 4 and 5 (Docket Nos. 76, 79, 80).

[2]On March 10, 2009, after the hearing on confirmation, Debtors filed an objection to Claim Nos. 4 and 5. That matter was scheduled for hearing on May 7, 2009. The Court will not reopen the record on the pending matters, nor delay this decision any longer, to consider new evidence outside of the record admitted at the confirmation hearing.

judicial notice that the "prime rate" of interest, as of the date of the hearing on confirmation, was 3.25 percent (3.25%).

The ballot report (Docket No. 70) shows and the Court finds that the only ballots submitted by the Secured Creditors in Class II and Class III reject DIP's Plan, and Class IV accepts based on the only ballot submitted in that class by Green Tree Servicing ("Green Tree"). By virtue of the ballot for Class IV, the Court concludes that at least one class of impaired claims, has accepted the plan in satisfaction of 11 U.S.C. § 1129(a)(10).

## FACTS

Gary and Darla Jean Hand ("Darla") (together referred to as "Hands" or the "DIP") are married and live on a property located 11 miles east of Bonner, Montana, on U.S. Highway 200 East, with river frontage on the Blackfoot River (hereinafter "the Property"), known as Tract 1-B on Certificate of Survey No. 5813, consisting of either 27.06 or 28.06 acres. Tract 1-A on Certificate of Survey No 5813, consisting of 11.02 acres, is not scheduled on Schedule A of Hands' bankruptcy schedules and is not considered part of the Property. Gary testified they purchased the Property with their parents[3] in 1975. They moved into a manufactured home on pads on the Property in 1997-98, where they have lived, made improvements financed by loans, and operated businesses on the Property while they raised their 6 kids. Green Tree financed the purchase of the 1998 manufactured home on the Property and has a lien against it. Claim Nos. 2 and 7[4] filed by Green Tree include copies of a retail installment contract and security agreement signed by Gary and Darla dated 9-29-97 for the purchase of a new manufactured home. Gary

---

[3]He testified that their mother lives on the Property.

[4]Claims 2 and 7 appear to be duplicate claims.

3

testified that the modular home could be moved off the Property.

Gary testified that the improvements include a well, septic system, electrical facility, five rental cabins and another unfinished cabin, a cafe/restaurant and a full liquor license[5]. McKee testified that the improvements are very well done and that more structures can be built on the Property.

The DIP operate Blackfoot River Rentals on the Property, a business that rents inner tubes and rafts, and a shuttle service for floaters. Gary testified that Gary and Darla are the only employees of the businesses. They work five days per week, and he testified that their income is sufficient to pay all their business expenses and their living expenses.

Claim Nos. 4 and 5 filed by the Secured Creditors include loan documents. Claim 4 includes a promissory note in the principal amount of $895,000 signed by Gary Hand and Jean M. Hand in May 2005. The note provides for interest at the rate of 12.95% per annum, and for late charges, attorney fees and costs upon default. The note is secured by a Montana Trust Indenture dated May 6, 2005, describing the security as: "Two tracts of land located in Government Lot 6 of Section 6, Township 13 North, Range 16 West, P.M.M., Missoula, Montana, being more particularly described as Certificates of Survey Numbers 247 and 248[6]", plus an abandoned railroad right of way, and all buildings, fixtures and improvements. The trust indenture provides for a trustee sale upon default at paragraph 14, and it was duly recorded in the

---

[5]Both appraisals Ex. 1 and Ex. A state that the cabins, café, Debtor's manufactured home and other improvements are located on Tract 1-B of the Property, while the other parcel, Tract 1-A, was valued as vacant tract notwithstanding the improvements. Ex. 1, p. 33; Ex. A, p. 19.

[6]This description does not match the legal descriptions for the DIP's property found at Ex. A, page 10, and Ex. 1, p. 6, where the property is described as two parcels, Tracts 1-B and 1-A in Certificate of Survey No. 5813. No explanation exists for the discrepancy in the record.

4

Missoula County records.

Claim No. 5 includes a promissory note dated October 11, 2006, in the principal amount of $315,000 payable at an interest rate of 15%[7] per annum, and provides for late charges, attorney fees and expenses upon default. The note is signed by Gary and Darla J. Hand, and is secured by a trust indenture signed by Gary and dated September 11, 2006, describing the security as in Ex. 1 and A as "Tract 1-B on Certificate of Survey No. 5813, located in Government Lot 6 within Section 6, Township 13 North, Range 16 West" in Missoula County, Montana. That trust indenture provides for a trustee's sale upon default, and was recorded.

The DIP have marketed the Property for sale through their realtors since October 2008 in magazines, websites and local newspapers. The original listing price for the Property was $2.1 million. Ex. 1 states at page 6 that the $2.1 million listing price includes only Tract 1-B, and "does not include Parcel 2 [Tract 1-A][8]." Gary testified that he set the listing price high at $2.1 million, so they could readjust. On redirect examination he testified that $2.1 million is what they needed to get out of the Property, but later testified that at a sale price of $1.7 million the DIP can pay all their creditors and pay a tax on a capital gain which their accountant fixed at the sum of $181,000. DIP's realtor McKee testified that they lowered the listing price to $1.9 million as of the date of the hearing, and that they have received six enquiries regarding the property by the date of the hearing, including from other realtors.

McKee described the Property as a unique "A property" located entirely on the Blackfoot

---

[7]Ogle testified that the $315,000 note is in a junior lien position, which is why it was written with a higher interest rate.

[8]Stevens states at page 10 of Ex. A that Tract 1-A is in the name of Gene M. Hand. Hogan refers at page 6 of Ex. 1 to a recorded quit claim deed, "but that is an intra-party transfer."

River with 670 feet of river frontage. He testified that the cabins are all hand crafted and very well done. He testified that the property could operate a fly fishing shop and an RV park in addition to its present businesses.

McKee testified that he markets other properties with river frontage and that waterfront properties as a whole sell quicker. However, he testified that the current recession impacts every piece of property on the market, including the DIP's, and that the market definitely is slower than it was last year. McKee testified that he has not seen either a decline or appreciation in the prices for recreational property, but he has seen more seller financed or alternatively financed transactions recently.

Hogan testified that the real estate market around Missoula has been in a recession since mid-2008. His appraisal Ex. 1 states at page 15 that the commercial real estate market has begun an increase in activity, but Hogan testified that that statement is out of date and the general market is static. Stevens agreed that the market is in a recession.

The Debtors filed their Chapter 11 petition on September 16, 2008, with their Schedules and Statements listing assets valued at $2,395,143.58, including $2.1 million in real property, and total liabilities of $1,303,648.73. Schedule A lists Tract 1-B as Gary's property with a current market value of $2.1 million, encumbered by secured claims totaling $1,210,000. Schedule B lists personal property, including the manufactured home.

Schedule D lists secured creditors, including the Secured Creditors named above, as having claims secured by first or second liens on Tract 1-B. Schedule D lists the amount of the first position secured claim as $895,000, and the amount of the second position as $315,000, for a total of $1,210,000. The DIP did not mark the Secured Creditor's secured claims on their

6

original Schedule D as disputed, contingent or unliquidated.  Green Tree is listed on Schedule D with a claim in the amount of $54,036.91 secured by the mobile home.  Schedule F lists $39,611.82 in unsecured nonpriority claims, almost all of which are for credit card purchases. Schedules I and J list DIP's current monthly income as $907.48 and their current monthly expenses as $1,534.41.

The Statement of Financial Affairs lists the DIP's businesses and interests[9], and answers "None" in response to questions asking them to list suits, repossessions and foreclosures.  DIP's income from their businesses in years 2007 is listed as $2,952 each, and in 2008 as $1,476 each. Their other income in the two years preceding commencement of the case is listed as $62,797.16 drawn from a 401K account in 2006.

The 11 U.S.C. § 341(a) meeting of creditors was held on October 14, 2008.  The Secured Creditors filed Proofs of Claim Nos. 4 and 5 on November 13, 2008, and filed amended claims on January 28, 2009.  Claim 4 states the amount of the claim on the petition date as $1,015,818.72, and states that it is secured by both Tracts 1-A and 1-B.  The itemization attached states the total secured claim as of January 28, 2009, is $1,065,593.64 including post-petition interest of $42,497.58 at the per diem rate of $321.9513, late fees, escrow fees and professional fees and costs.  Claim 5 is for the second lien position on Tract 1-B, and states the amount of the claim as $366,948.39 on the petition date, plus post-petition interest[10] and fees raising it to $386,729.39 as of January 28, 2009.

---

[9]The DIP both are officers and own 50% interests in corporations identified as Blackfoot River Rentals and McNamaras Landing.

[10]Claim 5 states the per diem interest on the attachment at the rate of $129.10 per diem, increasing to $129.45

The total amount of Claims 4 and 5 on the petition date is $1,382,767.11. Total per diem interest on Claims 4 and 5 totals at least $451.05[11]. The DIP did not file objections to Claim Nos. 4 or 5 prior to the hearing on confirmation[12], so for purposes of confirmation they constitute prima facie evidence of their validity and amount under F.R.B.P. 3001(f). To calculate the total on the date of the confirmation hearing the Court adds respective interest accruing on each claim up to that date. As of the date of confirmation, February 12, 2009, 149 days of postpetition interest had accrued on Claim 4 in the amount of $47,970.75, and on Claim 5 in the amount of at least[13] $19,235.90. The total amount of the Secured Creditors' claims as of the effective date of the Plan, not including any postpetition attorney fees and costs[14], is $1,449,973.76.

The DIP filed their Plan (Docket No. 27) and first disclosure statement on December 15, 2008. The Plan describes the Secured Creditors' claims in Class II and III at page 4 as undisputed and unimpaired. Article IV proposes at page 5 to pay out of the sale of the property both Class II and III claims, in the petition date amounts stated on Claims 4 ($1,015,818.72) and 5 ($366, 948.39), within 2 years of confirmation and that they shall accrue interest at 6%. Ogle

---

[11]$329.9513 + 129.10 = $451.0513

[12]DIP filed their objections on March 10, 2009. They object to the professional fees and costs, and object to the interest rate as usurious. With respect to usury, the Secured Creditors' response (Docket No. 82) cites Mont. Code Ann. § 31-1-107(1) which allows parties to agree in writing to payment of any rate of interest that does not exceed the greater of 15% or an amount 6 percentage points above the prime rate.

[13]For purposes of this Memorandum the Court uses the lower $129.10 per diem for Claim 5.

[14]Both promissory notes provide, under the default provisions, that in the event the borrowers file bankruptcy the lenders shall be allowed attorney fees and costs under 11 U.S.C. § 506.

testified that the 6% interest provided for the Secured Creditors' claims under DIP's Plan is not adequate, and should be 10% on the big loan and 12% on the small loan based on the DIP's poor credit worthiness.

The DIP reserve the right in the Plan to litigate the extent of the Secured Creditor's collateral. Article IX of the Plan provides that this Court retain jurisdiction including hearing and determining any DIP objection to a filed claim.

The Third Amended Disclosure Statement was filed with the Secured Creditors' consent and approved on January 21, 2009. The approved Disclosure Statement describes the DIP's Plan at page 6 as a liquidating Plan, with the real estate to be sold within two years of confirmation and if a sale does not occur the real estate "shall be surrendered to the secured creditors[15]." If the Property sells for $2,100,000, the proceeds, as Hands discuss on pages 7 and 8, are to be used first to pay secured claims of creditors with liens against real estate, next to unsecured priority claims including administrative expenses, real estate commissions and closing costs of approximately $130,000, and fees for the DIP's accountant, attorney and appraiser as approved by the Court, and in addition quarterly payments owed to the U.S. Trustee's office in the amount of $9,750, and any remaining proceeds will be used to pay unsecured claims. Page 8 states that DIP's professional fees are expected to be around $30,000 plus the real estate commission of six percent (6%).

Page 8 assumes a sale price of $2.1 million, which is contrary to Gary's testimony at the hearing and contrary to both appraisals. After paying the commissions and fees, the Secured

---

[15]In response to the Court's question, Debtors' counsel reiterated that the Debtors intend and agree to include language in their Disclosure Statement that they will surrender the Property to the Secured Creditors at the expiration of the 2 year marketing period if it is not sold.

Creditors[16]' and Green Tree's liens, it states the remaining sum available as $494,174.64, subject to a $181,000 capital gains tax[17], leaving $313,141.64 available for unsecured claims, and $40,244.26 left over on page 9. Page 9 contemplates future litigation against the Secured Creditors regarding the scope of the trust indenture involving DIP's mother. On page 9 the DIP recognize that the market for high value properties is weakening due to difficulties in the credit market.

The liquidation analysis attached to the approved Disclosure Statement states $2.1 million as the fair market value for Tract 1-B, which exceeds their own appraisal, and a $1.4 million liquidation value. Gary testified that his opinion on the value is now $1.7 million in accordance with the appraisal, Ex. 1, which he testified was enough to pay all their creditors and the capital gains tax. After allowing $129,000 for cost of sale of Tract 1-B, and nothing for post-petition interest[18] or professional fees to the Secured Creditors, the liquidation analysis shows a surplus to Debtors in the sum of $3,350 after paying the liens of Green Tree and the Secured Creditors, all from the sale of their titled vehicles, boats and trailers.

The Secured Creditors filed their motion to modify stay (Docket No. 31) on December 31, 2009, alleging at paragraph 2(f) that the DIP are in default of payments due under secured notes since October of 2007. The DIP filed objections that do not dispute their default under the

---

[16]The amounts of the Secured Creditors' liens on page 8 are stated in the amount of Claims 4 and 5 as of the petition date, without postpetition interest or fees and costs which are included in Claims 4 and 5.

[17]Gary testified that the accountant calculated that the sale of the DIP's real estate will generate a capital gain tax in the amount of $181,000.

[18]The approved Disclosure Statement states that oversecured creditors are entitled to post-petition interest at page 7.

notes and trust indentures, but allege that the Secured Creditors are adequately protected by an equity cushion of between $300,000 to $700,000.

On January 12, 2009 (Docket No. 35), the DIP amended their Schedule D which, after they listed the Secured Creditors' claims in Class II and III as undisputed in their Plan, DIP marked "x" in the box "Disputed" next to the claim amounts.

The Secured Creditors filed objections to confirmation (Docket No. 62) on several grounds, including that the DIP's Plan is confusing in its treatment of their claims, modifies a claim secured by their residence in violation of § 1123(b)(5), fails to satisfy the "best interest of creditors" test under § 1129(a)(7)(A)(ii), is not feasible as required under § 1129(a)(11), and is not fair and equitable as required under § 1129(b) due to the 6% interest rate which is inadequate for the risk of nonpayment and the condition of the real estate market and financial markets. Ogle testified that the Plan was not feasible because no equity exists in the Property after deducting the cost of real estate commissions, estimated capital gains tax from the prospective sale, U.S. Trustee fees, DIP's attorney's fees, and the amounts of the Secured Creditors' secured claims.

McKee, Hogan, Stevens and Ogle each testified that the economy is in recession.  Ogle testified that conditions are much worse than last year.

**A.  Hall/ Hogan Appraisal – Ex. 1.**

Hogan is a commercial real estate appraiser with a MAI designation, whose firm Hall-Widdoss and Company, P.C., ("Hall-Widdoss")[19] was employed by the DIP to perform an appraisal of the Debtors' Property.  Ex. 1 is the appraisal report in a summary format for the

---

[19]Steven A. Hall is also an MAI appraiser with Hall-Widdoss.

11

Debtor's Property prepared by Hall-Widdoss, signed by both Steven A. Hall ("Hall") and Hogan

on page 66.  Hogan testified that they interviewed both of the DIP and reviewed all pertinent data

in preparing Ex. 1.

Hogan agreed that the Property is unique in its location on the Blackfoot River, and as

such is the last to suffer in a static real estate market.[20]  He testified that he does not term the

property as recreational use property, but rather that the "highest and best use" of Parcel 1, Tract

1-B, is as a subdivision development with condominiums, based on the high land value.  Ex. 1,

pp. 36-42.

Hogan/Hall arrived at market value[21] for the DIP's Property in two parcels.  Parcel 1 is

Tract 1-B and comprised of 27.06 acres of land with a log café building, five finished cabins and

one unfinished cabin.  Ex. 1 at page 64 lists the market value of Parcel 1 "as is" as of December

9, 2008, as $1,700,000, and lists the market value of Parcel 2 (Tract 1-A), which consists of

11.02 acres of land, "as is" in the amount of $650,000.00.

Hogan testified that they used the Cost Approach and the Sales Comparison Approach in

arriving at their opinion of the value in Ex. 1, and that they gave more weight to the Sales

Comparison Approach because the sales were taken directly from the market.  He explained that,

because the underlying land value is such a big component of the value, they did not utilize the

Income Approach because there is too much land value and too few cabins, so the Income

Approach would not produce a fair market value.  On cross examination he testified that the

_____

[20]He testified that his analysis showed that the value of small tracts of land increased in value through April of 2008.

[21]Defined at page 7 of Ex. 1.

12

Property is a limited income producing property.  At page 5 Ex. 1 states:

> In terms of the appraisal service requested, this is defined as a rural commercial improved property.  The property type and the age/condition of the property suggest that not all three valuation methodologies are relevant.  Peer review would not expect to see the income approach within this appraisal.  Given the limited business operating histories, the property type, and limited market data the income approach is not a reliable methodology.  Based on that discussion, it is our conclusion that the other two approaches, the cost approach and the sales comparison approach, need to be employed within this appraisal.

Ex. 1, page 52, lists the valuation of Tract 1-B using the Cost Approach as $1,620,000.

Hogan testified that they arrived at the $1,620,000 figure by looking at four land sales to arrive at a value for the land of $1,140,000[22].  The four sales are described at pages 46-47 of Ex. 1, and used a per acre value of $42,000 to arrive at $1,140,000.  Hogan then calculated replacement cost new of the café, new cabins and site improvements, less depreciation, obsolescence and a charge for the unfinished cabin, added that to the land value and rounded the result off to $1,620,000 under the Cost Approach at Ex. 1, p. 52.  Hogan used a replacement cost of $127.96 per square foot. ft. ("/sf") for the finished cabins, and $136.58/sf for the café, after checking with three log home manufacturers to get their range of replacement costs.  Ex. 1, p. 48.  Hogan testified that the big difference between his appraisal and Stevens is that Stevens used a $55/sf replacement cost new, while Hogan/Hall used a range of $100 to 125/sf and a final indication of $127.96.  Hogan testified that he calculated double the amount of square footage for the cabins, 2,536 sf, over that calculated by Stevens, and that his depreciation amount was greater than Stevens'.  Hogan testified that his cost approach valuation differed from Stevens' by $20,000.

Hogan's Sales Comparison Approach begins at page 53 of Ex. 1.  Hogan testified that

----

[22]Hogan testified that they found comparable sales of land on the Blackfoot River in fixing their land values.

they could not find a comparable sale of a similar property, so they looked at sales of rural cafes and subtracted the land value, and looked at sales of small motels. Ex. 1 lists three currently listed properties, at their listing prices, at pages 54-56, to arrive at value of the cabins/sf. Hogan testified that the Alta Meadows Ranch on page 54, and Anglers Ranch on page 55, are listings and not sales prices. Stevens testified that listing price is not indicative of market value, but instead reflects "hopes and dreams" rather than sales prices.

The actual sales which Hogan used begin on page 56 with 3206 Highway 93 North in Seeley Lake, followed by Jackson Hot Springs, which Hogan testified was not directly comparable, but which he included because it was a "complex property" which sold. Page 57 includes two listings, then a sale of Pine Shadows Motel in West Yellowstone, which sold on May 22, 2008. Page 58 includes two more sales in 2006 and 2007, then a reconciliation. In all, Hogan testified, he used four comparable sales, none of which are located on the Blackfoot River, but he took into account Blackfoot River frontage when arriving at his land value.

Hogan testified that he used the four comparable sales to arrive at a value per dwelling unit. Hogan/Hall arrived at a per unit value for the five cabins of $60,000, or $118.30/sf, $50/sf for the unfinished cabin, $100/sf for the café, plus a value for the site improvements of $77,333. Adding those values to the land value gave a resulting value using the Sales Comparison Approach of $1,700,000 as of December 9, 2008[23], on page 62 of Ex. 1. Stevens testified that Hogan's methodology is a valid method to arrive at component value, but that comparable sales must be chosen carefully. Stevens testified that the West Yellowstone location for the

---

[23]Hogan testified that the December 9, 2008, valuation for the Property is not substantially different from the value on the date of the filing of the Debtors' petition.

comparable sale on page 57 of Ex. 1 is different than the Blackfoot River location, and that merely taking out the land value does not establish proper comparability.

Under cross examination Hogan testified that he weighted his valuation under the Sales Comparison Approach more heavily than the Cost Approach because of the high underlying land value. He testified that the Property could be marketed in a year or less at Ex. 1's appraised value of $1.7 million, but he admitted that the lack of listings on the Blackfoot River affects the marketing period.

**B. Stevens Appraisal – Ex. A.**

Stevens is a MAI appraiser and has been a real estate appraiser for 30 years. He testified that he has performed between ten to twelve appraisals of recreational properties in the last 10 years, and he has performed appraisals of Chico Hot Springs, Jackson Hot Springs and Lolo Hot Springs. He testified that recreational properties such as the subject Property are hard to market because they are "lifestyle properties", and purchasers "are buying themselves a job." He testified that he has performed appraisals of several outlying restaurants in the Missoula area.

Stevens testified that the Property is very unique in the amount of river frontage. The two parcels total just over 39 acres with good egress. Ex. A, pp. 3, 5. He testified that the Property is an ongoing project that is not finished, and his valuation includes the potential for future development. Stevens disagreed with Hogan that the highest and best use of the Property was for condominium development. Stevens testified that he believed the DIP have a good plan to develop their property, but that they need to develop an RV Park in addition to their cabins.

Stevens analyzed the Property's current market value using two valuation approaches: The Cost Approach and the Income Capitalization Approach. Both methods are discussed in Ex.

15

A, and Stevens testified as to both methods.  Stevens testified his conclusion that the market value of Tract 1-B consisting of the 28.06 acres land and improvements, at a cash sale as of October 24, 2008, is $1,450,000.  Ex. A, pp. 33, 35.  That valuation excludes the value of the Debtors' manufactured home, which Stevens testified is not on a permanent foundation.  Stevens agreed that the modular home could add value, but that did not take into consideration Green Tree's lien on the home.

Page 32 of Ex. A states the valuation that Stevens calculated by the Cost Approach as $2.1 million for both Tracts.  Under cross examination Hogan subtracted the $500,000 land value of Tract 1-A from Stevens' Cost Approach value of $2.1 million and arrived at a Cost Approach value in the amount of $1.6 million, $20,000 less than Hogan's valuation by the Cost Approach.

 In determining the value by the Cost Approach Stevens first arrived at an underlying value of the land by comparing four land sales of similar land sales with river or water frontage, and after considering adjustments for changing market conditions and size, Stevens arrived at a value per acre of $45,000 for Tract 1-A, rounded to $500,000, and $36,500 per acre for Tract 1-B rounded to $1,025,000.  Ex. A, p. 18-19.  Stevens did not adjust the sales for changing market conditions and stated:  "In the case of the subject property, and due to the current economic conditions, it appears that appreciation ceased in mid to late 2007."  Ex. A, p. 18.

Stevens testified that he did not have enough data to conclude that a decline in market value occurred, and that he has not seen any decline.  Stevens testified that he is sure that the real estate market will see appreciation in 2009, but he was not sure that appreciation will occur in this market segment.  He testified that Western Montana has been immune from the last two recessions, but he does see properties remain on the market and test the resolve of sellers.

16

Stevens valued the cabins at $55.62/sf, added value for porches/decks, plumbing and lofts, and deducted $7,500 to finish cabin 6, with a resulting cabin value estimate of $137,814. Ex. A, pp. 19-20. Stevens was asked about Hogan's opinion that Stevens' opinion on cost structure was low, and Stevens explained the difference between "replacement cost," which uses utility, and "reproduction cost" which uses like-kind and quality[24]. Stevens testified that the market does not care what you paid to have a structure built, and that cost does not equate to value. Stevens agreed that the Hands may have experienced greater costs in building the cabins, but he testified that using reproduction costs requires factoring in functional obsolescence. On cross examination Stevens testified that the cabins are only 3 or 4 years old and he did not know if the obsolescence was substantial, but that it must be considered.

Stevens added the values for the land, improvements, cabins restaurant, and depreciation to arrive at a total valuation by the Cost Approach of $2,097,276 which he rounded to $2,100,000. By subtracting from that amount the land value of Tract 1-A, Tract 1-B has a value by the Cost Approach of $1,600,000. Ex. A, pp. 19-21. Stevens disagreed with the suggestion on cross examination that he should add in an additional $100,000 in value for the cabins to correlate with Hogan's opinion, and testified that it would be an error to do so.

The Income Capitalization Approach determines the present worth of future income-producing capabilities of the Property. Ex. A, p. 22. Stevens disagreed with Hogan's statement in Ex. 1, p. 5, that the Income Capitalization Approach was not a reliable methodology given the limited operating history, property type and limited market data. Stevens asserted that the Income Capitalization Approach is a reliable indicator of market value for this Property. Stevens

---

[24]Hogan includes definitions of the two terms at page 47 of Ex. 1.

17

agreed that not enough improvements existed on the Property, but that it is possible to segregate the land with improvements to make the calculation, with the rest of the land as excess. Stevens testified that the Property was built as income producing property, and so the Income Capitalization Approach is reliable for this Property.

Stevens added the effective gross income from the restaurant and cabins totaling $100,147, subtracted expenses of $57,142 for pre-tax net income of $43,005, to which Stevens applied a 10% capitalization rate ("cap rate"), added value for excess land and water and sewer capacity, added value for Tract 1-A and calculated a value of $1,830,050 which he rounded to $1,830,000. Ex. A, pp. 29, 31. Without Tract 1-A, Stevens calculated a value of $1,330,000.

Stevens used revenues per square foot from four rental comparables of restaurants located in Missoula. Ex. A, pp. 22, 24-26. When asked on cross examination whether a rural restaurant rental would be more appropriate Stevens agreed that it could be, but that he only had the four comparable rentals. Stevens arrived at the cabin rental revenue from comparison with eight businesses which have separate cabins, and used cabin rentals ranging from $100/night to $165/night. Ex. A, pp. 27, 29.

Stevens testified that he estimated the 10% capitalization rate by referring to a simplified mortgage loan, and that his 10% capitalization rate is supported by the market. His method for estimating his 10% capitalization rate is set forth at page 30 of Ex. A and is calculated from long term mortgage loans and rates of return on investment.

Stevens did not use the Sales Comparison Approach. He testified that he only used the Sales Comparison Approach in performing appraisals of recreational properties, such as Granite Hot Springs and Lolo Hot Springs, but that he had comparable sales at the time he performed

18

those appraisals.  At page 14 of Ex. A Stevens explained his methods and/or techniques

employed:

> Whenever possible, all three basic approaches to value are employed.  The resulting indications of value are then correlated into a final estimate of market value.
>
> In the course of investigating the marketplace, sufficient data was found to develop the Cost and Income Capitalization Approaches.  The Sales Comparison Approach was deleted due to the lack of sufficient information from which a meaningful indication could be drawn.
>
> In the final correlation, emphasis will be placed on the approach or approaches that offer the most reliable data.

On page 32 of Ex. A Stevens wrote:  "The Sales Comparison Approach was not

developed due to the lack of data which would generate a meaningful indication."  Stevens

testified that the Seeley Lake motel which Hogan used as a comparable sale at Ex. 1, p. 56, is a

motel with all the rooms under one roof, not separate cabins like the subject Property, and that

because of the uniqueness of the Property and its cabins Stevens did not find meaningful

comparable data.

In his reconciliation Stevens wrote that he gave the Cost Approach a considerable amount

of weight because the Property is special purpose property with a significant asset on site:  river

footage.   Ex. A, p. 32.  Stevens gave his Income Capitalization Approach only an average

amount of weight, although it is an income producing asset, noting that it "relies on economic

data, since no historic operating data was available."  Ex. A, p. 32.  After considering both

approaches Stevens estimated the market value as of October 24, 2008, as $1,950,000,

segregated into $500,000 for the vacant Tract 1-A and $1,450,000 for the land and improvements

on Tract 1-B.  Ex. A, p. 33.

Stevens set the exposure period at page 13 of Ex. A at from 6 to 12 months.  He testified that his opinion on the exposure period has been changed by the market and he no longer knows, but "guesses" that the exposure period will be at least two years.

## DISCUSSION

### I.  Confirmation Requirements & Burden of Proof.

Bankruptcy Courts have an affirmative duty to ensure that the Plan satisfies all 11 U.S.C. § 1129 requirements for confirmation.  *Liberty National Enterprises v. Ambanc La Mesa Partnership (In re Ambanc La Mesa Ltd. Partnership)*, 115 F.3d 650, 653 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *In re L & J Anaheim Assoc.*, 995 F.2d 940, 942 (9th Cir.1993); *In re McKay*, 14 Mont. B.R. 296, 299-300 (Bankr. D. Mont. 1995), quoting *In re Roberts Rocky Mountain Equipment Co., Inc.*, 76 B.R. 784, 789, 4 Mont. B.R. 230, 238 (Bankr. D. Mont. 1987).  Section § 1129(a) sets forth sixteen[25] requirements to be met before the bankruptcy court may confirm a Plan.  *Ambanc*, 115 F.3d at 653.

The DIP have the burden of proof to satisfy all of the confirmation requirements under § 1129.  *In re Mont-Mill Operating Company*, 16 Mont. B.R. 61, 64 (Bankr. D. Mont. 1997); *In re Prudential Energy*, 58 B.R. 857, 862 (Bankr. S.D. N.Y. 1986).  The Court must confirm a Chapter 11 debtor's plan of reorganization if the debtor proves by a preponderance of the evidence either that (1) the Plan satisfies all sixteen requirements of § 1129(a), or (2) if the only condition not satisfied is the eighth requirement, 11 U.S.C. § 1129(a)(8), the Plan satisfies the

---

[25] Thirteen requirements existed prior to the amendments added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

"cramdown" alternative to this condition found in 11 U.S.C. § 1129(b), which requires that the

Plan "does not discriminate unfairly" against and "is fair and equitable" towards each impaired

class that has not accepted the Plan. *Ambanc*, 115 F.3d at 653; *In re Arnold and Baker Farms*,

177 B.R. 648 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir.1996), *cert. denied*, 519 U.S.

1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997); *see also In re Red Lodge Country Club Estates

Joint Venture*, 13 Mont. B.R. 172, 181 (Bankr. D. Mont. 1994).  In the instant case § 1129(a)(8)

is not satisfied because the Secured Creditors are impaired and reject the DIP's Plan, so the Plan

must satisfy the cramdown. *Ambanc*, 115 F.3d at 653.  If the DIP fail to satisfy their burden of

proof, for example if the record does not include sufficient evidence to show that all

requirements of § 1129 are met, confirmation must be denied.

## II.  Feasibility.

The feasibility requirement is set forth at § 1129(a)(11), which requires that a court

confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation,

or the need for further reorganization, of the debtor or any successor to the debtor under the plan,

unless such liquidation or reorganization is proposed in the plan."  *In re Brotby*, 303 B.R. 177,

191 (9th Cir. BAP 2003).  To demonstrate that a plan is feasible a debtor need only show a

reasonable probability of success.  *Id.*; *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1984).

*Brotby* notes that the Code does not require the debtor to prove that success is inevitable, *In re

WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or.2002), and a relatively low threshold of proof

will satisfy § 1129(a)(11), *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762

(Bankr.D.Nev.1998), so long as adequate evidence supports a finding of feasibility.  *Brotby*, 303

B.R. at 191-92; *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985).

In the instant case the Plan is a liquidating plan, which is specifically provided for under § 1129(a)(11).  While the DIP have the burden of proof under § 1129, the Court notes that the relatively low threshold of proof to satisfy § 1129(a)(11) is even more easily met where the plan itself calls for liquidation rather than reorganization that would require a reasonable assurance of commercial viability.  *Mont-Mill*, 16 Mont. B.R. at 64, *quoting Rocky Mountain Equip.*; *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985).  "The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."  *Id.*  In the instant case the DIP have employed competent professionals to market Tract 1-B, and the Plan proposes to surrender the Property to the Secured Creditors after two years if it is not sold.  Although the recession likely will require a longer period of time than normal to sell Tract 1-B, the Court finds that the low burden on the DIP to show that the Plan is feasible in liquidating or surrendering the Property after 2 years is met.

**III.  Cramdown.**

The BAP in *Wells Fargo Bank Nw, N.A. v. Yett (In re Yett)*, 306 B.R. 287, 290-91 (9th Cir. BAP 2004) discusses the terms of art "cramdown" and "cram down":

> [T]hey refer to the modification of the rights of a secured creditor over its objection. As noted by a leading scholar:
>
>> In many cases filed under Chapter 13 of the Bankruptcy Code, the debtor wants to keep her car or truck and modify the terms of her car note in a manner that is not acceptable to the lender. And, in many Chapter 11 business cases, the debtor wants to keep its equipment or building and modify the terms of its secured loan in a manner that is not acceptable to the lender. A bankruptcy court can confirm a Chapter 11, 12, or 13 plan that modifies the rights of a secured creditor without the consent of that creditor. In other words, the plan can be "crammed down" over the objection of the secured creditor.

22

....

[T]here are two separate valuations involved in the cram down of a secured claim. First, the court must determine the value of the creditor's collateral. Second, the court must determine the value of the deferred payments proposed by the plan to determine whether the present value of such payments at least equals the value of the collateral.

. . . .

The cram down of a secured claim involves not only section 506 [providing that creditor's secured claim is limited to the value of the collateral], but also section 1129(b)(1), section 1222(b)(2), or section 1322(b)(2), which permit a Chapter 11, 12, or 13 plan to "impair" or "modify" the rights of holders of secured claims. Any plan impairment or modification must be confirmed by the bankruptcy judge. In approving such a change over the objection of the affected secured creditor, the court must find that the requirements of sections 1129(b)(2)(A), 1225(a)(5)(B)(ii), or 1325(a)(5)(B)(ii), generally referred to as the cram down provisions, have been satisfied.
....

[T]he courts and commentators have generally treated the question of how the cram down interest rate should be determined as a question that is answered the same in Chapter 11, 12, and 13 cases. Note the italicized phrase, "value, as of the effective date of the plan," in each of these sections. Each of these provisions requires that a secured creditor who is not either paid in full or permitted to repossess must receive the present equivalent value of its secured claim.

David G. Epstein, *Don't Go and Do Something Rash about Cram Down Interest Rates*, 49 Ala. L.Rev. 435, 439-442 (1998)(footnotes omitted).

Applying the above, the first task is to fix the valuation of Tract 1-B.  This Court has long

held that the valuation of collateral for purposes of fixing a claim must be at or near the time of

confirmation.  *In re Barnes*, 14 Mont. B.R. 187, 190-91 (Bankr. D. Mont. 1995); *In re Rivers*, 10

Mont. B.R. 210, 211 (Bankr. D. Mont. 1991).

Hogan/Hall set the valuation at $1.7 million at page 66 of Ex. 1.  Stevens values Tract 1-

B at $1,450,000 at pages 33 and 35 of Ex. A.  Gary agrees with the valuation on Ex. 1.  While a debtor's estimate of value may be acceptable in certain cases, the Court may give little weight to the opinion if not based upon sufficient facts.  *In re Schmitt*, 19 Mont. B.R. 57, 75 (Bankr. D. Mont. 2002); *In re Hungerford*, 19 Mont. B.R. 118-19 (Bankr. D. Mont. 2001); *In re Schenk*, 67 B.R. 137, 140 (Bankr. D. Mont. 1986).  The Court assigns little weight to Gary's opinion testimony because it is contradicted by his Plan and Disclosure Statement that state the value at his original listing price of $2.1 million, which he testified he set high.

Both appraisals Ex. 1 and A are within $20,000 in their results under the Cost Approach, so the Court sees no need to resolve their disputes about square footage and replacement costs for the cabins.  The main difference between the two appraisals is each appraiser's reasons for not using one of the three approaches to value.  Stevens did not use the Sales Comparison Approach in Ex. A, and Hogan/Hall did not use the Income Capitalization Approach in Ex. 1

The determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact – which in a bench trial like the instant case is the bankruptcy court. *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); *Arkwright Mutual Insurance Co. v. Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997); Barry Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 702.2; 4 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 702.05[2][a] (2nd ed. 2002).  After review of Ex. 1 and Ex. A and after observing Hogan and Stevens each testify under oath at hearing, and under cross examination, the Court assigns greater weight to Stevens' testimony and appraisal, Ex. A, than to Hogan's, and the Court finds that the valuation of Tract 1-B on the date of confirmation is $1,450,000 as stated in Ex. A.

At page 14 of Ex. A Stevens wrote:  "Whenever possible, all three basic approaches to

24

value are employed." Ex. A states at pages 14 and 32, and Stevens testified, that he found

sufficient data to develop the Cost and Income Capitalization Approaches, but that the "Sales

Comparison Approach was deleted due to the lack of sufficient information from which a

meaningful indication could be drawn." Stevens was able to develop the Income Capitalization

Approach based on "economic data, since no historic operating data was available." Ex. A, p.

32. Hogan/Hall were hired by the DIP and so had access to the DIP actual operating data as well

as the economic data available to Stevens.

      Hogan's statement at page 5 of Ex. 1 explaining why he did not employ the Income

approach, seems counterintuitive. Hogan describes the Property as a rural *commercial* improved

property, but states that the income approach is not a reliable methodology to value the Property

"[g]iven the limited business operating histories, the property type, and *limited market data* . . . ."

If it is true that the market data is limited, then it appears to the Court that the Sales Comparison

Approach would be less reliable than the Income Capitalization Approach in valuing what Hogan

writes is a "commercial improved property".

      Hogan's characterization of the business history of the Property as "limited" is at odds

with Gary's testimony that he bought the property in 1975, moved there in 1997, and his

Statement of Financial Affairs shows that he has been operating businesses on the Property at

least for a few years. This Court agrees with Stevens that all three approaches should be

employed "whenever possible," and that the resulting indications should then be correlated into a

final estimate of value. That means that any artificially low result from the Income

Capitalization Approach can be addressed, as Stevens did at page 32 of Ex. A, where in the

reconciliation he gave the Income Capitalization Approach only an average amount of weight

and the Cost Approach a greater amount of weight because he relied on economic data since no

historic operating data was available.

Hogan/Hall had the same access to economic data as Stevens, and in addition they had

DIP's historic operating data, and included it for the cabins at page 37 of Ex. 1 and for the café at

page 40, but they still declined to develop the Income Capitalization Approach in Ex 1.  Their

reasoning for not developing the Income Capitalization Approach is stated most clearly at pages

43 of Ex. 1:  "We have proven through market interpretation continued use of the property as

nightly rentals is not the highest and best use[26], as improved.  Therefore, the application of the

income approach is simply not necessary."  While it may be true that the highest and best use of

the Property is other than what DIP are presently engaged in, Hogan/Hall's decision deprived the

Court of the benefit of their opinion under the Income Capitalization Approach.  The likelihood

of a purchaser buying Tract 1-B for the purpose of converting it to condos and subdividing it,

with adequate financing in the midst of a recession in the real estate market and financial

markets, is purely speculative.  Because of Hogan/Hall's failure to utilize available data and state

the value of Tract 1-B, a commercial income-producing property, under the Income

Capitalization Approach, the Court gives little weight to Hogan's valuation testimony and value

opinion in Ex. 1, and finds the valuation of Tract 1-B is $1,450,000 as stated in Stevens'

appraisal, Ex. A pp. 33, 35.

Stevens declined to develop the Sales Comparison Approach in Ex. A because of the lack

of comparable sales and "lack of sufficient information from which a meaningful indication

---

[26]"The highest and best use, as improved, would be to condo the existing cabins and
subdivide the remainder of the property."  Ex. 1, p. 40.

could be drawn." Ex. A, p. 14.  Ex. 1 admits at page 5 that there is "limited market data" which was part of Hogan/Hall's explanation for not developing the Income Capitalization Approach, but despite limited market data Ex. 1 at pages 55 through 58 cites comparable sales and property listings, none of which are located on the Blackfoot River, to develop the Sales Comparison Approach.  The most recent of the four comparable sales on page 61 of Ex. 1 was dated May of 2008, so almost all of them predate the current recession.

The use of listing prices does not comport with the definitions of value at page 7 of Hogan/Hall's appraisal, Ex. 1.  There "Market Value" is defined alternatively as a value "that presumes the transfer of a property," or

> "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the property is not affected by undue stimulus.  *Implicit in this definition is the consummation of a sale ....*"

Gary testified that his $2.1 million listing price was high and based on what he needed.  Stevens testified that listing prices represent an owner's "hopes and dreams" and are not indicative of market value.  Because of the absence of a sale, listing prices offer little in the way of probative evidence and do not meet the definition of market value.  Hogan/Hall's use of listing prices in Ex. 1 detracts from the weight the Court gives their opinion.

Further proof of the weakness of the Sales Comparison Approach is provided at page 62 of Ex. 1, in valuing the site improvements:

> The value of the site improvements is very difficult to accurately quantify under the sales comparison approach.  As stated, no sales of similar type properties were uncovered and no other meaning [sic] data was found that would lead to a reasonable conclusion of value.  *Therefore, we looked at the indication from the cost approach as the best evidence of that component.*  (Emphasis added).

27

The land value on page 62, $1,140,000, also was taken directly from the Cost Approach section of Ex. 1, pp. 47 and 52, without a separate analysis or discussion in the Sales Comparison Approach at pp. 53-62.  In other words the Sales Comparison Approach in Ex. 1 is little more than a rehash of the Cost Approach, with the only differences appearing from a comparison of pages 52 to 62 being deductions in the Cost Approach on page 52 for depreciation and obsolescence, which are not included under the Sales Comparison Approach.

In sum, the Court finds and concludes that the valuation of Tract 1-B is $1,450,000 as stated in Ex. A, pp. 33, 35.

The § 1129(b)(2) cramdown provision specifies that a fair and equitable plan provide one of three alternatives for the holders of secured claims:  (A)(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; or (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims. *Ambanc*, 115 F.3d at 653; *In re Boulders on the River*, 164 B.R. 99, 105 (9th Cir. BAP 1994).  At issue in the instant case is § 1129(b)(2)(A)(i)(II):  whether "each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed

amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property."  § 1129(b)(2)(A)(i)(II); *McKay*, 14 Mont. B.R. at 303.

DIP's Plan proposes no deferred cash payments, but instead proposes payment in full of the Secured Creditors' allowed claims with interest at the rate of 6%, or surrender of the Property if it is not sold within two years.  As of the date of the hearing on confirmation the Secured Creditors' claims totaled $1,449,973.76.  At the proposed interest rate of 6% their claims would accrue annual interest in the amount of $86,998.43, or $238.36 per day.  At this valuation the Secured Creditors have already lost their equity cushion due to accrued interest.  The Court finds that the DIP's Plan fails to satisfy the payment requirement of § 1129(b)(2)(A)(i)(II), and this case must be dismissed[27] without further delay to avoid prejudice to the Secured Creditors.

The Court has found that the market value of Tract 1-B is $1,450,000, but this result would be substantially the same if the Court had adopted the $1.7 million value in Ex. 1.  The six percent commission for the real estate agent, from the approved Disclosure Statement, on $1.7 million equals $102,000.  Gary testified that a capital gains tax in the amount of $181,000 will be due on the sale.  The total of those two amounts is $283,000, which deducted from $1.7 million leaves $1,417,000, which is less than the $1,449,973.56 total of Claims 4 and 5 on the date of the confirmation hearing, without allowing for the Secured Creditors' claims under § 506(b) and the promissory notes for postpetition fees and costs.  Allowing the DIP's Plan to go forward would result in either failure to pay the Secured Creditors their allowed claims, or the generation of a capital gains tax which the DIP will be unable to pay.

---

[27]Failure to confirm a plan is "cause" for dismissal under 11 U.S.C. § 1107(b)(4)(J).

Furthermore, the evidence admitted at the hearing failed to support the DIP's proposed 6% interest rate. The BAP in *Boulders on the River*, 164 B.R. at 105, noted that the Ninth Circuit applies the "formula rate" approach for determining the interest payable on the deferred payment of an obligation under the cramdown. *See also In re Fowler*, 903 F.2d 694, 697 (9th Cir. 1990); *In re Camino Real*, 818 F.2d 1503, 1508 (9th Cir. 1987). Under this approach the court starts with a base rate and adds a risk factor based on the risk of default and the nature of the security. *Boulders on the River*, 164 B.R. at 105; *In re Fowler*, 903 F.2d at 697. The interest rate determination is to be made on a case-by-case basis. *Boulders on the River*, 164 B.R. at 105; *In re Camino Real*, 818 F.2d at 1508.

The Supreme Court addressed the calculation of present value interest under § 1325(a)(5)(B)(ii) in *Till v. SCS Credit Corp.*, 541 U.S. 465, 479-80, 484-85, 124 S.Ct. 1951, 1961-62, 1964-65, 158 L.Ed.2d 787 (2004) (plurality opinion), and set "prime plus" or the formula rate as the proper method for determining the interest rate that would provide present value. Most courts that have considered the issue have held that, since § 1325(a)(5)(B)(ii) remains unchanged under BAPCPA, *Till* remains valid under BAPCPA. *Trejos v. VW Credit, Inc., et al. (In re Trejos)*, 374 B.R. 210, 220 n.9 (9th Cir. BAP 2007). As noted in *Yett*, 306 B.R. at 290-91, and given the same phraseology of "value, as of the effective date of the plan," the cram down interest rate should be determined the same in Chapter 11, 12, and 13 cases.

A contract rate of interest may be evidence of the proper rate for a plan, but it is not conclusive. *See Hungerford*, 19 Mont. B.R. at 112 (citing cases). The Supreme Court placed the evidentiary burden on the creditor to present evidence of a higher interest rate (the portion associated with the risk factor), reasoning that the creditors "are likelier to have readier access to

30

any information absent from the debtor's filing." *Till*, 541 U.S. at 479, 124 S.Ct. at 1961. *Till* dealt with commercial lenders, while in the instant case it does not appear that the Secured Creditors are in the business of lending money or have any readier access to information than the DIP. Nonetheless, the Secured Creditors offered evidence in the form of Ogle's testimony that the recession is worsening, and that the 6% interest provided for the Secured Creditors' claims under DIP's Plan is not adequate and should be 10% on the big loan and 12% on the small loan, based on the DIP's poor credit worthiness. Ogle's testimony is uncontroverted. Although the Court took judicial notice of the 3.25% prime rate on the date of the confirmation hearing, the DIP offered no expert witness testimony, no testimony by Gary or other witness, and offered no other evidence at the confirmation hearing to controvert Ogle's testimony. However, Ogle's testimony did not address the formula rate consisting of the prime rate and any additional rate for risk. The Plan's bald statement of a 6% rate of interest also lacks any discussion of appropriate risk factor, and the Plan is not evidence. Other than Ogle's testimony, the only evidence which the Court could find in the record of an interest rate is in Ex. A at page 30, in the discussion of capitalization rates, that current long term mortgage rates range from 7.50% to 9.00%, and the DIP's proposed 6% does not fall within that range. The Court finds that the DIP failed to satisfy their burden of proof under § 1129(b)(2)(A)(i)(II) to support their 6% cramdown interest rate with any evidence and that the Secured Creditors failed their burden under *Till*.

Courts have stated that in general a plan is not fair and equitable with respect to secured creditors when the plan unduly shifts the risks of a successful reorganization to those creditors. *In re Crown Oil, Inc.*, 16 Mont. B.R. 534, 539 (Bankr. D. Mont. 1998) (citing cases). In the instant case all the risk is shifted to the Secured Creditors, and their equity cushion has vanished.

31

In these circumstances, given the amount of the Secured Creditors' claims and accruing interest, the value of the security and the risk that Debtors will default under the Plan, this Court finds no support for the 6% interest rate, which adds a 2.75 % above prime risk factor, in the record, or at law. *Boulders on the River*, 164 B.R. at 105; *In re Fowler*, 903 F.2d at 697.

The Court must consider the Plan in the context of the rights of objecting creditors and the particular facts and circumstances of the debtor's financial plight in determining whether a plan is fair and equitable under § 1129(b)(2). *Crown Oil,* 16 Mont. at 539, quoting *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (Matter of Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1352 (5th Cir. 1989) ("[T]echnical compliance with the requirements of section 1129(b)(2) does not assure that the plan is fair and equitable.  Instead, this section merely sets minimal standards ....") (other citations omitted).  Based upon Ogle's testimony and the discussion in Ex. 2 regarding mortgage interest, the complete lack of evidence by the DIP supporting their proposed 6% interest rate and Secured Creditors failure to establish a risk factor, this Court finds and concludes that DIP's Plan fails the "fair and equitable requirement" of § 1129(b)(2)(A)(i)(II). *Boulders on the River*, 164 B.R. at 105; *In re Fowler*, 903 F.2d at 697.

Having determined that the DIP's Plan fails to satisfy the requirements of § 1129(b)(2), the next step is to determine the appropriate disposition of this case.  Denial of confirmation is cause for dismissal or conversion to Chapter 7, whichever is in the best interests of creditors and the estate, under 11 U.S.C. § 1112(b).  This case has been pending since September 16, 2008, confirmation will be denied for the reasons set forth above, and other matters are pending, which will likely increase the Secured Creditors' allowed claims, which already appear to have become undersecured.  This Court has repeatedly held that the Court must take the Plan in its entirety as

32

proposed, and cannot write Plans for Debtors.  *Mohr*, 5 Mont. B.R. at 249 n.2, citing *Jannssen Charolais Ranch, Inc.*, 73 B.R. 125, 128, 4 Mont. B.R. 290, 297 (Bankr. D. Mont. 1987).  The Court concludes that cause exists to dismiss this case under § 1112(b), and that dismissal is in the best interests of creditors and the estate.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction of this Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).

2.  Confirmation of the DIP's Chapter 11 Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

3.  The valuation of the Secured Creditor's security comprised of Tract 1-B land and improvements described above is fixed in the amount of $1,450,000, having been determined in light of the purpose of the valuation and of the proposed use of such property, and the Secured Creditors' secured claims for cram down purposes under § 1129(b)(2)(A)(i)(II), after notice and a hearing.

4.  DIP's Chapter 11 Plan fails to satisfy the "fair and equitable" confirmation requirement of § 1129(b)(2)(A)(i)(II) by failing to provide that the Secured Creditors receive on account of their allowed secured claims the amount of such claims of a value, as of the effective date of the Plan, of the value of the Secured Creditor's interest in the estate's interest in their security, with respect to both the amount of cash payments and interest rate proposed in the Plan.

5.  Cause exists under 11 U.S.C. § 1112(b)(4)(J) to dismiss this Chapter 11 bankruptcy case based upon DIP's failure to satisfy the confirmation requirements of § 1129(b)(2)(A)(i)(II); and dismissal is in the best interests of creditors and the estate.

33

**IT IS ORDERED** a separate Order shall be entered in conformity with the above

sustaining the Secured Creditor's objection to confirmation, denying confirmation of the DIP's

Chapter 11 Plan and dismissing this case.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

34